UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

JACQUELINE L. BURTS,                    )
                                        )
                    Plaintiff,          )
                                        )
            v.                          )            No.  2:12CV93 ACL
                                        )
CAROLYN W. COLVIN, Acting               )
Commissioner of Social Security,[1]     )
                                        )
                    Defendant.          )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the Commissioner's final decision denying Jacqueline L. Burts'

applications for disability insurance benefits (DIB) and child disability benefits

(CDB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.,* and

application for supplemental security income (SSI) under Title XVI of the Act, 42

U.S.C. §§ 1381, *et seq.*  All matters are pending before the undersigned United

States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. §

636(c).  Because the Commissioner's final decision is supported by substantial

evidence on the record as a whole, it is affirmed.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
As such, she is substituted for Michael J. Astrue as the defendant in this cause of action.  Fed. R.
Civ. P. 25(d).

# I. Procedural History

On September 20, 2010, plaintiff Jacqueline L. Burts applied for disability insurance benefits (DIB), child disability benefits (CDB) and supplemental security income (SSI), claiming she became disabled on June 26, 2009, because of reflex sympathetic dystrophy (RSD), chronic pain syndrome, arthritis in the right ankle, and poor circulation in the right leg. (Tr. 121-38, 166.) Upon initial consideration, the Social Security Administration denied plaintiff's claims for benefits. (Tr. 44-46, 57-71.) At plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on August 22, 2011, at which plaintiff, a medical expert, and a vocational expert testified. (Tr. 22-43.) On October 27, 2011, the ALJ issued a decision (Tr. 9-18) denying plaintiff's claims for benefits. The ALJ "conclud[ed] that, considering the claimant's age, education, work experience, and residual functional capacity plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 17.) On October 23, 2012, upon review of additional evidence, the Appeals Council denied plaintiff's request to review the ALJ's decision. (Tr. 1-5.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ erred in his decision by failing to consider Social Security Ruling (SSR) 03-2p, which governs the evaluation of disability in cases involving RSD, and that his failure to

consider SSR 03-2p affected his determination of plaintiff's credibility.  Plaintiff also claims that the ALJ failed to adequately explain his application of the factors required to be considered in determining credibility and improperly relied on plaintiff's failure to take prescribed pain medication in his determination.  Finally, plaintiff contends that the Appeals Council erred when it failed to consider new and material evidence submitted for review of the ALJ's decision.  Plaintiff requests that the final decision be reversed and that she be awarded benefits or that the matter be remanded for further consideration.

## II.  Testimonial Evidence Before the ALJ

A.    Plaintiff's Testimony

At the hearing on August 22, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was twenty-three years of age.  Plaintiff is single.  Plaintiff graduated from high school.  Plaintiff lives with her boyfriend's grandparents in the upstairs portion of their house.  (Tr. 26, 33.)

Plaintiff's Work History Report shows that plaintiff worked in fast food restaurants from September 2003 to August 2005.  From August 2005 to October 2008, plaintiff worked as a certified nurses' assistant (CNA) in skilled nursing or residential care facilities.  From November 2008 to February 2009, plaintiff worked as a mounter in a factory.  From February to June 2009, plaintiff again

worked as a CNA in a residential care facility.  (Tr. 146.)

Plaintiff testified that she underwent surgery in November 2009 for a bruised ankle joint, as well as ligament and tendon repair.  She reported that after surgery the pain became worse.  Plaintiff testified that she currently has constant pain radiating through her right leg and into her foot, which her doctors have advised was caused by nerve damage.  (Tr. 26-27, 29.)  Plaintiff testified that her pain has worsened within the previous year.  (Tr. 28.)

Plaintiff testified that her foot is sometimes cold and discolored and that she has veins that "pop out" of her leg.  Plaintiff testified that she also sometimes has blisters on her toes that are tender and sore.   Plaintiff testified that she experiences pain when her foot is touched and that she cannot wear shoes.  Plaintiff testified that she can tolerate sandals.  Plaintiff testified that sheets or blankets, certain clothing, and walking worsen her pain, because of the rubbing against her leg.  (Tr. 27-28.)   Plaintiff testified that she does "okay" going up the stairs at home, but that there are some days when she cannot walk, at which time she crawls or scoots up and down the stairs or uses her crutches.  (Tr. 34.)

Plaintiff testified that her doctors have told her that she has chronic pain syndrome and that nothing more can be done for her pain.  Plaintiff testified that she was discharged from her doctor's care, because of her financial inability to pay for treatment.  Plaintiff testified that she suggested to her doctors that they

amputate her leg, but they declined.  (Tr. 27, 30.)

Plaintiff testified that she currently takes calcium, vitamin D, Lavora, and Alprazolam as needed for sleep.  Plaintiff testified that she was recently prescribed Neurontin, but cannot fill the prescription.  Plaintiff testified that she does not take any narcotic medication.  (Tr. 35-36.)

Plaintiff testified that the pain interferes with her sleep but that medication helps her sleep.  Plaintiff testified that she is most comfortable lying on her left side in bed, or in a recliner with her leg elevated and propped on two body pillows. Plaintiff testified that she elevates her leg every day.  Plaintiff testified that she also applies ice packs and heat compresses to relieve the pain.  (Tr. 29-31.)

The pain sometimes causes plaintiff to cry.  Her focus and concentration is also affected, because sometimes her pain is so unbearable it's all she can think about.  (Tr. 31.)

As to her daily activities, plaintiff testified that she goes grocery shopping but uses a motorized scooter and usually has someone with her.  (Tr. 31.)  Plaintiff testified that she can drive short distances.  She testified that she either has someone with her or uses cruise control on the car when she drives long distances. She sometimes drives with her left foot.  (Tr. 29-30.)  Plaintiff prepares simple meals and sits when she cuts fruits or vegetables.  She has mowed the lawn with a riding mower, but the vibration of the mower increases her pain.  (Tr. 32-33.)

Approximately once a week, plaintiff sits for about an hour and picks up apples from the ground at her boyfriend's grandparent's orchard. Plaintiff testified that she manages her father's finances because he cannot read or write. Plaintiff testified that she sometimes takes her father to the grocery store when she visits him. (Tr. 33-34.)

B.      Testimony of Medical Expert

Dr. Albert Oguejiofor, a board-certified internist, testified at the hearing as a medical expert in response to questions posed by the ALJ and counsel.

Dr. Oguejiofor testified that plaintiff's diagnosed medically determinable impairments were history of fall with right ankle sprain, right ankle pain, and RSD. Dr. Oguejiofor testified that plaintiff did not need to elevate her right leg inasmuch as there was no evidence of vascular or circulation problems. (Tr. 36-37.)

C.      Testimony of Vocational Expert

Dr. Karen E. Nielsen, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Dr. Nielsen characterized plaintiff's past work as a fast food worker and mounter as light and unskilled; and as a CNA as medium and semi-skilled. (Tr. 39.)

The ALJ asked Dr. Nielsen to assume an individual of plaintiff's age and education and who is able to perform the exertional demands of sedentary work in

that she can occasionally lift or carry ten pounds, can lift or carry five pounds, can stand and walk about two hours of an eight-hour workday, and can sit about six hours of an eight-hour workday. (Tr. 39-40.) The ALJ asked Dr. Nielsen to further assume the individual can

> occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds; occasionally balance, occasionally stoop, occasionally kneel, occasionally crouch, occasionally crawl.
>
> The individual is to avoid working around unprotected heights, open flames, and dangerous and moving machinery. And due to the individual pain the individual can understand, remember, and carry out short and simple instructions, and maintain attention and concentration for extended periods on simple tasks.

(Tr. 40.) Dr. Nielsen testified that such a person could not perform any of plaintiff's past relevant work, but could perform other sedentary, unskilled jobs such as order clerk, of which 2,500 such jobs exist in the State of Missouri and 185,000 nationally; fan assembler, of which 2,000 such jobs exist in the State of Missouri and 185,000 nationally; and optical goods worker, of which 1,300 such jobs exist in the State of Missouri and 135,000 nationally. Dr. Nielsen testified that if such a person was required to elevate her right leg throughout the workday at waist level, she could not perform such work or any other work. (Tr. 40-41.)

In response to counsel's questions, Dr. Nielsen testified that a person who missed four hours of work a week, or more than two days a month, would probably not be able to maintain employment. (Tr. 41-42.)

### III. Medical Records Before the ALJ

On June 29, 2009, plaintiff visited Dr. Eric Kondro and reported that she had fallen on some steps and twisted her right ankle. Plaintiff was prescribed medication, including Vicodin.[2] (Tr. 191.)

Plaintiff visited the University of Missouri Health Care Orthopedic Clinic (Orthopedic Clinic) on August 4, 2009, with complaints of continued foot pain. Nurse Practitioner (NP) Parvin Behrouzi-Jareh noted plaintiff's medical history to include injuries to the right ankle beginning in 1997 with ligament repair performed in 2000. Plaintiff reported that she reinjured her ankle in June 2009, which caused severe pain and bruising about the plantar and dorsal portions of her foot. Plaintiff reported that she had been told that she could return to work, however, felt she would not make it, because her pain was too intense. Plaintiff reported her current pain to be at a level seven out of ten, but that she sometimes experiences pain at a level ten. Plaintiff reported taking Vicodin for her pain. Physical examination showed no swelling or bruising of the right ankle. Tenderness was noted. Plaintiff was hypersensitive to touch at the lateral side of her foot dorsally and plantarly. Pulses were palpable and sensations were intact. NP Behrouzi-Jareh noted that plaintiff tried to not put pressure on the lateral side

---

[2] Vicodin is used to relieve moderate to severe pain. *Medline Plus* (last revised May 15, 2013) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html>.

of her foot when she walked.  Plaintiff had decreased dorsi- and plantar flexion about the right foot when compared with her left foot.  Tenderness at the anterior talofibular ligament (ATFL) area was noted, but NP Behrouzi-Jareh determined it not to be significant.  Strength about the right foot was noted to be 3-4/5.  X-rays of the right ankle showed some changes at the tibiotalar area for possible osteochondral defect (OCD), but nothing significant.  NP Behrouzi-Jareh diagnosed plaintiff with right foot pain, right foot sprain, right ankle sprain, and claw toes.  An MRI was ordered.  (Tr. 231-34.)

An MRI taken of the right ankle on August 4, 2010, showed medial talar dome OCD with suspected unstable versus loose fragment.  It was noted that no ATFL was identified and that a calcific loose body was observed along its expected course.  (Tr. 227-28.)

Plaintiff visited Dr. Saul Generoso Trevino at the Orthopedic Clinic on August 26, 2009.  He noted plaintiff's range of motion about the right ankle was somewhat limited.  Tenderness was noted over the lateral aspect of the foot, with minimal tenderness noted about the medial aspect and no effusion.  Dr. Trevino noted plaintiff to have weak intrinsics of her foot.  Dr. Trevino prescribed a pneumatic CAM boot and instructed plaintiff to participate in a home program of physical therapy with intrinsic exercises.  A determination would be made in one month as to whether surgery was necessary.  (Tr. 224-26.)

Plaintiff returned to the Orthopedic Clinic on September 25, 2009, and reported to NP Behrouzi-Jareh that her pain was currently at a level four or five and that she continued to take Vicodin for pain. Trace edema was noted about the lateral side of the ankle with pain about the anterior talus area as well as the lateral and posterior sides. Plaintiff had good dorsiflexion and plantar flexion, except the right side was not quite equal to the left. Pulses were palpable and sensations were intact. NP Behrouzi-Jareh recommended that plaintiff continue with the CAM boot and exercises since she had shown slight improvement. NP Behrouzi-Jareh recommended that plaintiff take ibuprofen for pain control. Plaintiff was instructed to return in three or four weeks to meet with Dr. Trevino. (Tr. 221-23.)

Plaintiff visited Dr. Kondro on October 16, 2009, who noted there to be a bone bruise on the right foot and a chip on the right ankle. It was noted that plaintiff had an upcoming orthopedic appointment with possible surgery. (Tr. 190.)

On October 28, 2009, plaintiff visited Dr. Trevino and complained of continued pain. Dr. Trevino noted the MRI to show an OCD lesion with loose fragment in the surface and a possible loose body over the lateral aspect of the ankle. Tenderness was noted with motion and over the peroneal tendons. Surgical options were discussed. (Tr. 219-20.)

On November 10, 2009, plaintiff reported to NP Behrouzi-Jareh that she was

experiencing severe pain and was not sleeping at night. NP Behrouzi-Jareh noted plaintiff to be taking Darvocet.[3] Physical examination showed plaintiff to continue to have tenderness to palpation at the lateral side of her ankle and at the ATFL area. Tenderness was noted all about the ankle. A small amount of swelling was noted on the lateral side of the ankle. Dorsiflexion and plantar flexion were present, but with pain. Severe pain was noted with eversion and inversion. Flexor and extensor tendons were intact. Pulses were palpable and sensations were intact. Plaintiff consented to surgery, and preoperative evaluation was scheduled. (Tr. 216-18.)

On November 16, 2009, plaintiff underwent right peroneal tendinoscopy with debridement of pronator brevis tear, right ankle arthroscopy with debridement of synovitis, and microfracture treatment of OCD to the anterior medial talus. Plaintiff was placed in a short-leg splint and was discharged to home that same date. (Tr. 211-14.) During follow up examination on November 24, Dr. Trevino noted plaintiff to be doing well and her pain was controlled with pain medication. Plaintiff was able to move her ankle without difficulty. Plaintiff was neurovascularly intact. Plaintiff was instructed to follow up in two weeks. (Tr. 209-10.)

---

[3] Darvocet is used to relieve mild to moderate pain. *Medline Plus* (last revised Mar. 16, 2011) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601008.html>.

An x-ray taken of the right ankle on December 8, 2009, showed irregularity to the talar dome that possibly represented a subtle nondisplaced fracture or OCD. A possible subtle avulsion fracture; tendinous insertion anchors overlying the distal fibular; as well as edema and swelling were noted. (Tr. 208.) Dr. Trevino reviewed the x-ray and determined it to show no abnormalities except a small lucency on the medial aspect of the talus. Dr. Trevino found plaintiff to be doing well and instructed her to return in three weeks. (Tr. 206-07.)

On December 30, 2009, Dr. Trevino noted plaintiff to be doing well and to have good range of motion about the ankle with minimal swelling. Plaintiff reported having recently fallen and that she experienced some residual pain. Dr. Trevino instructed plaintiff to start weight-bearing in the boot and to start Thera-Band exercises. Plaintiff was also instructed to take Aleve (naproxen) as necessary. (Tr. 203-04.) An x-ray taken that same date showed subcortical lucency to the medial talor dome. (Tr. 205.)

Plaintiff visited NP Behrouzi-Jareh on January 22, 2010, and reported feeling better, however, stated that she continued to have a lot of pain and was currently experiencing numbness and tingling in her lower leg. Physical examination showed pain and tenderness with palpation about the ankle with prominent soft tissue swelling. NP Behrouzi-Jareh observed plaintiff's foot was purplish in color, especially when dangling down for a longer period of time, as

well as hypersensitivity to touch about the lateral side of the ankle and prominent rashes on the toes bilaterally. Pulses were palpable and sensations were intact. There was tightness about the Achilles tendon. NP Behrouzi-Jareh opined that plaintiff exhibited signs of RSD. Because of the level of pain reported by the plaintiff, NP Behrouzi-Jareh directed plaintiff to continue using the CAM boot and instructed her to increase her range of motion exercises. Plaintiff was instructed to take naproxen. NP Behrouzi-Jareh recommended physical therapy, but after learning plaintiff was already having difficulty with a $20,000 hospital bill, printed some exercises that plaintiff could do at home. (Tr. 200-02.)

On February 11, 2010, Dr. Kondro noted plaintiff's distal foot was cool and her right ankle had good range of motion. He diagnosed plaintiff with post-surgical RSD on the right and Raynaud's[4] and prescribed Amlodipine.[5] (Tr. 190.)

Plaintiff returned to Dr. Trevino on March 3, 2010, who concluded plaintiff developed RSD-type symptoms, including coolness in the feet, blisters on the toes, discomfort in the lower leg, and hypersensitivity. Plaintiff stated she could ambulate relatively freely while wearing the CAM boot, but not so well without it. Dr. Trevino noted plaintiff's attempt with physical therapy failed due to lack of

---

[4] Raynaud's disease is a condition that causes some areas of the body (i.e., fingers, toes, the tip of the nose and ears) to feel numb and cool in response to cold temperatures or stress. It causes smaller arteries that supply blood to the skin to narrow, limiting blood circulation to affected areas. Mayo Clinic (Oct. 20, 2011) <http://www.mayoclinic.org/diseases-conditions/raynauds-disease/basics/definition/con-20022916>
[5] Amlodipine is used to relax the blood vessels. *Medline Plus* (last revised Aug. 15, 2013)

insurance.  Physical examination showed coolness in both feet with some bluish

discoloration of the second toe, bilaterally.  Hypersensitivity was noted over the

incision, and range of motion was limited.  No real pain was noted with inversion

or eversion.  Plaintiff could dorsiflex to about five degrees and plantar flex to about

thirty-five to forty degrees.  Dr. Trevino referred plaintiff to the pain clinic.  (Tr.

198-99.)

Plaintiff visited Dr. Trevino on April 14, 2010, and reported that she was

limited to walking two to three blocks.  Examination showed plaintiff to have one-

quarter inch atrophy of the right calf.  Good range of motion was noted.  Plaintiff

continued to be somewhat tender over the anterior aspect of the ankle.  Dr. Trevino

opined that surgery was not indicated for plaintiff's condition and that she may

always have some residual pain.  Dr. Trevino opined that plaintiff needed to seek a

more sedentary job.   Plaintiff was instructed to return as needed.  (Tr. 196-97.)

Plaintiff visited NP Behrouzi-Jareh on July 15, 2010, with complaints of

swelling and ankle pain.  Plaintiff also complained that she could hardly walk.  She

rated her pain a level nine.  Plaintiff reported that she was unable to work because

of the pain.  Physical examination showed no swelling.  The Achilles tendon was

noted to be very tight with some inflammation.  Tenderness to light palpation and

to light touch was noted at the deep peroneal nerve.  Pulses were otherwise

---

<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html>.

palpable and sensations were intact. Dorsiflexion and plantar flexion were limited because of pain. NP Behrouzi-Jareh instructed plaintiff to take Aleve twice a day and to wear a sports brace on the ankle for support. Plaintiff was taught how to do exercises to stretch the Achilles tendon. NP Behrouzi-Jareh recommended that plaintiff attend physical therapy, but plaintiff reported being unable to pay for such treatment because of lack of insurance and lack of a job. Plaintiff was instructed to return as needed. (Tr. 194-95.)

On January 20, 2011, plaintiff underwent an evaluation for disability determinations at the University of Missouri Health Care Physical, Medical, and Rehabilitation Clinic. Plaintiff reported having increased pain in her right lower extremity subsequent to surgery in November 2009. Plaintiff reported having severe pain and intermittent swelling and color changes. Plaintiff reported being referred for pain management, but that she did not have the funds for such treatment. She rated her current pain to be at a level eight to nine, but that her pain is at a level five when at its best. Plaintiff reported that she could walk three blocks at the most, she crawls on the floor when her leg pain is significant, and uses her crutches once every two weeks. Plaintiff reported currently receiving no treatment for her condition and that she took over-the-counter anti-inflammatory medication. Physical exam showed hyperpigmentation over the lateral side of the ankle with small circular areas of discoloration. Plaintiff was able to do ankle rolls

actively without difficulty.  Both lower extremities were noted to be cold.  Normal

strength was noted in the ankle dorsi- and plantar flexors, but plaintiff complained

of pain with resisted flexion.  Girth of the right calf was noted to be 2.5 centimeters

smaller than the left.  Sensory deficit was noted from the knee to the foot in the

right lower extremity.  Callous formation on the toe pads was noted bilaterally,

indicative of walking without shoes.  Dr. Kevin D. Komes noted plaintiff to be able

to stand on her toes and heels and to be able to squat.  No warmth or swelling was

noted in either ankle.  Gait evaluation showed that plaintiff could walk at least fifty

feet without difficulty and without an assistive device.  Plaintiff's gait was noted to

be antalgic.  Dr. Komes diagnosed plaintiff with history of right ankle surgeries

and possible RSD.  Dr. Komes noted there to be no significant abnormality

demonstrated by physical examination, but that photographs presented by plaintiff

may demonstrate vascular instability of the right lower extremity.  Dr. Komes

opined that plaintiff:  would have no difficulty with sitting and should be able to

stand fifteen to thirty minutes continuously; should be able to walk fifteen minutes

continuously, but that her traveling may be limited by her ambulatory capacity;

could stand and/or walk at least two hours total in an eight-hour workday; and

could not sustain a forty-hour workweek on a continuous basis.  (Tr. 235-41.)

Plaintiff visited NP Behrouzi-Jareh on June 17, 2011, and reported that she

had recently sprained her ankle and that she was experiencing more pain and

swelling. Plaintiff reported the pain to be at a level eight, but that it was different from her RSD pain, which affected half of her leg. Physical examination showed no swelling. Skin discoloration was noted. NP Behrouzi-Jareh noted plaintiff to continue to have all of the components of RSD. Pain with inversion was noted, with hypersensitivity to light touch from under her knee down to the toes. No pain was noted with eversion and dorsi- or plantar flexion. Tenderness to palpation was noted about the ankle. An x-ray of the right ankle showed no change from previous studies. NP Behrouzi-Jareh reported having difficulty evaluating and examining plaintiff given the active status of her RSD and hypersensitivity. Plaintiff was given a removable cast and was instructed to return in four weeks. (Tr. 253-55, 256.)

Plaintiff returned to NP Behrouzi-Jareh on July 15, 2011, and complained of intermittent shooting pain radiating up her leg to the thigh area and down into the foot. Plaintiff reported slight improvement with the hypersensitivity but that she continued to have a lot of pain around her foot. She also reported discoloration and intermittent swelling. Plaintiff reported her pain to be at a level seven and that nothing controls it. Plaintiff reported that Xanax[6] helps her sleep. Physical examination showed atrophy of about one inch of the right calf. Skin discoloration

---

[6] Xanax (Alprazolam) is used to treat anxiety disorders and panic disorder. *Medline Plus* (last revised Nov. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html>.

was noted when compared to the other foot. Hypersensitivity was noted about the right ankle, but NP Behrouzi-Jareh noted it not to be as pronounced as the last visit. Some pain was noted with palpation of the first toe, but good flexion and extension. Dorsiflexion and plantar flexion were equal bilaterally. The remainder of the exam was unremarkable. NP Behrouzi-Jareh diagnosed plaintiff with right ankle sprain, right ankle pain, and RSD. NP Behrouzi-Jareh reported that she could not fully examine plaintiff for nerve or ligament damage, because of the nerve damage and hypersensitivity. Opining that plaintiff had a nerve problem, NP Behrouzi-Jareh ordered EMG and nerve conduction studies. Plaintiff's prescription for Xanax was refilled. (Tr. 250-52.)

Plaintiff underwent nerve conduction and EMG studies of the right lower extremity and lumbar paraspinals on August 4, 2011, which yielded normal results. There was no electrophysiologic evidence of right peroneal, tibial, or sciatic neuropathy, lumbosacral plexopathy, or radiculopathy. (Tr. 247.)

## IV.  Medical Evidence Submitted to Appeals Council[7]

In a letter dated December 9, 2011, and addressed "To Whom It May Concern," Dr. Kondro wrote that plaintiff was examined that date and was found to

---

[7] In determining plaintiff's request to review the ALJ's decision, the Appeals Council considered additional evidence that was not before the ALJ at the time of his decision. The Court must consider this evidence in determining whether the ALJ's decision was supported by substantial evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).

have signs and symptoms consistent with RSD of the right leg for which she was receiving treatment from specialists at the University of Missouri.  Dr. Kondro indicated the treatment might include nerve blocks and nerve stimulation implants. Dr. Kondro wrote, "I foresee this will be a chronic problem . . . and is certainly disabling at this time."  (Tr. 263.)

On February 2, 2012, plaintiff underwent right L3 and L4 sympathetic blocks for her diagnosed condition of right foot and ankle complex regional pain syndrome.  In recovery, plaintiff continued to have a significant amount of right leg pain without any improvement in her foot pain.  Morphine was administered, which gave her immediate relief.  (Tr. 266-67.)

On March 29, 2012, a thoracic spinal cord stimulator was temporarily implanted in plaintiff's spine for her diagnosed condition of complex regional pain syndrome with right lower extremity chronic neuropathic pain.  Plaintiff recovered in stable condition and was discharged that same date.  It was noted that a decision would be made in seven days as to whether plaintiff would receive a permanent implant.  (Tr. 271-73.)

## V.  The ALJ's Decision

The ALJ found that plaintiff last met the insured status requirements of the Social Security Act on December 31, 2010, and had not yet attained twenty-two years of age at the time of the alleged onset of disability, June 26, 2009.  The ALJ

found that plaintiff had not engaged in substantial gainful activity since June 26, 2009. The ALJ found plaintiff's OCD lesion of the right talus (status post microfracture procedure), status post peroneus brevis tear, and RSD to be severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 11-12.) The ALJ found that plaintiff had the residual functional capacity (RFC) to perform sedentary work[8] except that she should

> never climb ladders, ropes, or scaffolds or work around unprotected heights, open flames, or dangerous and/or moving machinery. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The claimant can understand, remember, and carryout [sic] short, simple instructions, and maintain attention and concentration for extended periods on simple tasks.

(Tr. 12.) The ALJ found plaintiff unable to perform any of her past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform other work as it existed in significant numbers in the national economy, and specifically, order clerk, final assembler, and optical goods worker. The ALJ therefore found that plaintiff was not under a disability from June 26, 2009,

---

[8] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and

through the date of the decision.  (Tr. 16-17.)

## VI.  Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  In order to receive CDB under the relevant provisions of the Act, plaintiff's disability must have commenced prior to her attaining twenty-two years of age.  20 C.F.R. § 404.350(a).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v.*

_____

other sedentary criteria are met."  20 C.F.R. §§ 404.1567(a), 416.967(a).

*Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairments are not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairments meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairments is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance, but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test,"

however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.     The credibility findings made by the ALJ.

2.     The plaintiff's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of the plaintiff's impairments.

6.     The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even

though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

For the following reasons, the ALJ committed no legal error, and his decision is supported by substantial evidence on the record as a whole.

A.      Evidence Submitted to the Appeals Council

After the ALJ issued his decision, plaintiff requested review by the Appeals Council and submitted new evidence, which included Dr. Kondro's December 2011 letter wherein he opined that plaintiff was disabled. Plaintiff claims that the Appeals Council erred when it "ignored" and "refused to consider [her] additional evidence" (Pltf.'s Brief, Doc. #14) inasmuch as such evidence related to the period prior to the ALJ's decision and thus was material to the decision. A review of the record refutes plaintiff's claim that the Appeals Council failed to consider this new evidence.

Under the Regulations, the Appeals Council must evaluate the entire record,

including any new and material evidence submitted to it after the ALJ's decision relating to the period on or before the date of the ALJ's decision. 20 C.F.R. §§ 404.970(b), 416.1470(b). If, upon consideration of the entire record, the Appeals Council finds that the ALJ's action, findings, or conclusion is contrary to the weight of all the evidence, it will then review the ALJ's decision. 20 C.F.R. §§ 404.970(b), 416.1470(b).

Here, the Appeals Council included plaintiff's additional evidence in the administrative record (*see* Order of Appeals Council, Tr. 5) and specifically stated in its Notice of Action that it considered this evidence in making its decision to deny plaintiff's request for review. (Tr. 1.) Upon such consideration, the Appeals Council determined that such evidence did not provide a basis for changing the ALJ's decision. (Tr. 2.) Accordingly, contrary to plaintiff's assertion, the Appeals Council did not "ignore" or "refuse to consider" this evidence, rather the Appeals Council did in fact consider it in accordance with the Regulations. Plaintiff's claim on this point fails.

Inasmuch as the Appeals Council considered this evidence in its determination not to review the ALJ's decision, such evidence is now a part of the administrative record that this Court must consider in determining whether the ALJ's decision continues to be supported by substantial evidence on the record as a whole. To the extent plaintiff argues that Dr. Kondro's December 2011 letter

affects the ALJ's decision, the undersigned notes that such letter contains Dr. Kondro's speculation as to future treatment and his opinion that plaintiff was disabled. A medical source's opinion that a claimant is disabled and unable to work, however, involves an issue reserved for the Commissioner and is not the type of opinion that the Commissioner must credit. *Renstrom v. Astrue,* 680 F.3d 1057, 1065 (8th Cir. 2012); *Ellis v. Barnhart*, 392 F.3d 988, 994-95 (8th Cir. 2005). To the extent the additional evidence before the Appeals Council showed plaintiff to have subsequently undergone nerve blocks and a nerve stimulation implant, such evidence does not undermine the ALJ's decision that while plaintiff experienced limiting pain, it was not to such a degree as to preclude the performance of a limited range of sedentary work. *See Perkins v. Astrue*, 648 F.3d 892, 901 (8th Cir. 2011) ("As is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is.") (internal quotation marks and citation omitted).

B.    Social Security Ruling 03-2p and Plaintiff's Credibility

In October 2003, the Social Security Administration issued SSR 03-2p in order to explain its policies for evaluating claims for disability on the basis of RSD. As described in the Ruling, RSD is a chronic pain syndrome most often resulting from trauma to a single extremity. The most common acute clinical manifestations include complaints of intense pain and findings indicative of

autonomic dysfunction – such as skin temperature changes and discoloration – at the site of the precipitating trauma. SSR 03-2p, 2003 WL 22399117, at **1-2 (Soc. Sec. Admin. Oct. 20, 2003). Symptoms of RSD are transient in nature. *Id.* at *4. This transient nature, however, must not affect a finding that the condition is a medically determinable impairment. *Id.*

Disability claims involving RSD are evaluated using the five-step sequential evaluation process, discussed *supra* at p. 21, just as for any other impairment. Although chronic pain is itself a symptom of RSD, the ALJ must continue to make a finding on the credibility of the claimant's subjective complaints of pain and other symptoms based on a consideration of the entire case record. 2003 WL 22399117, at *6; *see also Combs v. Astrue*, 243 Fed. Appx. 200, 205 (8th Cir. 2007). "This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 03-2p, 2003 WL 22399117, at *6. Such "other relevant evidence" in the record includes:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (Soc. Sec. Admin. July 2, 1996). *See also Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted) (the *Polaski* factors). Whether RSD or any other medically determinable severe impairment is alleged as a basis for disability, a claimant's credibility is for the Commissioner, and not the Court, to make. *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005); *e.g., Bondurant v. Astrue,* No. 09-328 ADM/AJB, 2010 WL 889932 (D. Minn. 2010). *See also Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007). Where an ALJ explicitly considers the *Polaski* factors, but then discredits a claimant's complaints for good reason, the decision should be upheld. *Hogan v. Apfel,* 239 F.3d 958, 962 (8th Cir. 2001).

In this case, the ALJ found plaintiff's RSD to be a severe medically determinable impairment. Plaintiff claims, however, that despite this finding, the ALJ failed to acknowledge SSR 03-2p and its policies governing the evaluation of

this impairment and, specifically, that chronic pain is a symptom of RSD sometimes immeasurable by objective medical findings. Plaintiff claims that by failing to consider SSR 03-2p, the ALJ wrongfully placed undue emphasis on the lack of objective findings in plaintiff's case and failed to consider the required factors when determining the credibility of her subjective complaints. For the following reasons, a review of the ALJ's decision shows him to have properly considered the *Polaski* factors in determining plaintiff's credibility and not to have placed too much weight on the objective medical evidence of record.

As an initial matter, the undersigned notes that the ALJ observed the medical evidence to show that plaintiff experienced tenderness and hypersensitivity to touch as well as an antalgic gait such that she is unable to stand and walk more than two hours in an eight-hour day. (Tr. 15.) Indeed, the ALJ noted this evidence to be consistent with Dr. Komes' January 2011 opinion that plaintiff was capable of standing and walking for at least two hours out of an eight-hour day as well as Dr. Trevino's statement that plaintiff needed to seek a more sedentary job. (Tr. 15-16.) Nevertheless, the ALJ set out numerous inconsistencies in the record upon which he discredited plaintiff's subjective complaints to the extent she claimed that her pain rendered her unable to work.

First, the ALJ noted that plaintiff took no form of pain medication other than over-the-counter medication. Such use of only over-the-counter pain relievers

suggests that the severity of the pain is not so great as to be disabling. *See Ostronski v. Chater*, 94 F.3d 413, 418-19 (8th Cir. 1996). To the extent plaintiff claims that the ALJ should not have relied upon plaintiff's lack of significant pain medication given her financial inability to afford such medication, a review of the record shows that no physician or other medical source prescribed significant pain medication subsequent to the November 2009 surgery or recommended anything other than over-the-counter anti-inflammatory medication. As such, the record does not show that plaintiff was ever placed in a position where she had to choose to forego prescribed pain medication, because of a lack of finances. The fact that no doctor recommended any pain medication beyond over-the-counter anti-inflammatories may be used by the ALJ to discount plaintiff's subjective complaints of pain. *See Clark v. Chater*, 75 F.3d 414, 417 (8th Cir. 1996).[9]

The ALJ also found plaintiff's daily activities to show that she is not precluded from performing work within the stated RFC, specifically noting plaintiff's ability to independently attend to her personal care, prepare meals, do laundry, use a riding lawnmower, dust her home, drive short distances, and manage her financial affairs. The undersigned also notes that plaintiff testified that she is able to grocery shop while sitting in a motorized scooter, pick apples while sitting,

---

[9] Plaintiff testified at the hearing that she was prescribed Neurontin, but could not afford to fill the prescription. A review of the medical record in its entirety, however, fails to show that any medical source prescribed this medication.

visit her father who lives in another town, take her father shopping when she visits him, and manage her father's finances. In addition, plaintiff's Function Report shows that she sometimes goes to the park with friends to watch their children play; vacuums each week; helps clean up after dinner; and reads, watches television, and scrapbooks every day. (*See* Tr. 156-61.) When viewed *in toto*, such activities are inconsistent with an assertion of disability. *See Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) (acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking are inconsistent with subjective complaints of disabling pain); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006) (acts such as performing household chores, mowing the lawn, raking leaves, shopping for groceries, visiting with friends, and driving a car inconsistent with subjective complaints of disabling pain); *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (acts such as cleaning the house, doing the dishes with help, making meals, visiting with friends, occasional shopping, and running errands inconsistent with complaints of disabling pain).

In addition, the ALJ's summary of the medical evidence shows him to have considered the numerous findings of essentially normal physical examinations that showed plaintiff to have normal range of motion about the ankle, minimal swelling, normal pulse, and intact sensation and that there was no medical necessity for plaintiff to elevate her leg. As noted above, the ALJ also summarized

the medical evidence that demonstrated plaintiff's tenderness and hypersensitivity to touch, and accounted for such findings in the RFC determination. While an ALJ may not discredit subjective complaints of pain solely because they are not fully supported by objective medical evidence, he may nevertheless consider such evidence in determining a claimant's credibility. *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002). A review of the ALJ's decision shows him to have properly reviewed and weighed all the relevant evidence of record, including the medical evidence, in determining plaintiff's credibility.

Because the ALJ adequately discussed the factors required by SSR 03-2p, SSR 96-7p, and *Polaski* in finding that plaintiff was not fully credible, and such finding is supported by good reasons and substantial evidence on the record as a whole, this Court must defer to the ALJ's determination. *Clevenger v. Social Security Admin.*, 567 F.3d 971, 975-76 (8th Cir. 2009); *Hogan*, 239 F.3d at 962. This is so even if substantial evidence would support an opposite conclusion. *Jones v. Chater*, 86 F.3d 823, 825-26 (8th Cir. 1996).

Finally, the mere failure of the ALJ to cite to SSR 03-2p in his decision does not equate with a finding that he failed to consider the Ruling or abide thereby. This is especially true here where a review of the ALJ's decision shows it not to run afoul of the policy considerations in the Ruling, and indeed to have complied with the Ruling's directives when evaluating plaintiff's RSD impairment. *Cf.*

- 32 -

*Holley v. Massanari,* 253 F.3d 1088, 1092 (8th Cir. 2001) (ALJ's failure to cite legal authority (*i.e., Polaski*) was not error where decision shows ALJ to have complied with such authority by considering factors required thereby).

## VII.  Conclusion

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole.  *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001).  "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion."  *Id.*  Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome, or because another court could have decided the case differently.  *Id.*; *see also Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).

For the reasons set out above on the claims raised by plaintiff on this appeal, a reasonable mind can find the evidence of record sufficient to support the ALJ's determination that plaintiff was not disabled from June 26, 2009, through the date of the decision.  Because substantial evidence on the record as a whole supports the ALJ's decision, it must be affirmed.  *Davis,* 239 F.3d at 966.  This Court may not reverse the decision merely because substantial evidence exists that may support a

contrary outcome.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of September, 2014.